UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PETER B. HOFFMAN, Regional Director   :
of Region 34 of the NATIONAL LABOR   :
RELATIONS BOARD,   :
      Petitioner   :   CIVIL ACTION NO.
    v.   :   3:08-CV-008 (JCH)
       :
PENNANT FOODS COMPANY,   :   APRIL 14, 2008
      Respondent   :

**RULING**

The NLRB, through its Regional Director, petitions this court for relief under

Section 10(j) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(j). Petitioner

claims that the Respondent, Pennant Foods Company ("Pennant"), has committed

numerous violations of the NLRA that require the prompt issuance of an injunction. For

the reasons that follow, the petition is **GRANTED IN PART** and **DENIED IN PART**.

I.    **BACKGROUND**[1]

Pennant is a food products company with a plant in North Haven, Connecticut.

The company manufactures frozen dough and bakery products, and it does a

substantial amount of business with the sandwich chain Subway. As of October 2001,

the production and maintenance workers at the North Haven plant were not unionized.

In October 2001, the United Autoworkers International Union ("the Union") filed

papers with the NLRB seeking to represent these workers at Pennant. GC Exh. 9(a).

The NLRB directed that an election be held, GC Exh. 9(c), and a vigorous campaign

---

[1] As will be discussed later, the parties in this case have been involved with
parallel administrative proceedings before the NLRB. Almost all of the background
information comes from evidence introduced at a hearing before an ALJ.

ensued that attracted local media coverage.  Throughout the election campaign,

Pennant employee Lee Mabry was the "face of the Union" in the local media, and he

was quoted extensively in print and broadcast outlets as making comments that were

critical of labor conditions at Pennant.  ALJ Tr. at 539-543.

The election was held in November 2001, and the Union lost by a vote of 99 to

63, with 15 challenged ballots untallied.  GC Exh. 9(e).  The Union challenged the

elections results before the NLRB, and it claimed that Pennant had engaged in a variety

of unfair labor practices.  That challenge was ultimately settled, and Pennant and the

Union agreed to rerun the election.  GC Exh. 8.  Pennant did not admit that it had

violated the NLRA.[2]

A re-run election was ultimately held on January 20, 2006, and the Union again

lost (this time by a vote of 84 to 54).  GC Exh. 9(f).  Nonetheless, the Union again

alleged that Pennant had committed a number of unfair labor practices in the period

leading up to the re-run election, and the Union again filed a variety of unfair labor

practice charges with the NLRB.

These charges were consolidated, and a hearing was held before an ALJ in late

2006 and early 2007.  ALJ Dec. at 1.  The ALJ issued a decision on September 17,

2007, in which he sustained some of the Union's claims.  Specifically, the ALJ found

---

[2] Before the election was rerun, however, the Union filed even more unfair labor charges against Pennant.  One ended in another settlement in which Pennant again did not admit that it had violated the NLRA.  GC Exh. 5.  Another charge, filed in May 2005, was resolved when NLRB that concluded that Pennant had violated the NLRA by retaliating against some employees who had participated in a strike prompted by unfair labor practices that Pennant had committed.  Pennant Foods Co., 347 NLRB No. 41, 2006 NLRB LEXIS 270 (June 27, 2006).

that Pennant had violated the NLRA in the following respects:

First, the ALJ found that Pennant had violated Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1),[3] through the actions of one of its Supervisors, Jennifer Rodriguez ("J. Rodriguez"). Late in the day on January 10, 2006, J. Rodriguez called Ricardo Rodriguez ("R. Rodriguez") into her office. At the time, R. Rodriguez was a quality control inspector, and J. Rodriguez was his immediate supervisor. According to the testimony of R. Rodriguez, J. Rodriguez asked him various questions about the Union's efforts, and then told R. Rodriguez to vote against the Union because doing otherwise might cause the factory to close, and could negatively impact R. Rodriguez's medical benefits. R. Rodriguez also testified that, on another occasion shortly before the election, J. Rodriguez again told him to vote "no."[4] ALJ Dec. at 7-8. The ALJ credited this testimony, and he concluded that J. Rodriguez's statements constituted an implied threat that Pennant would rather close the plant than deal with the Union. Id. at 8-9; cf. Daikichi Corp., 335 N.L.R.B. 622, 624 (2001) (finding a violation of Section 8(a)(1) when a Supervisor stated that the company "might" shutdown if the employees voted to recognize a union).

The ALJ also found that Pennant had committed a second violation of Section

---

[3] Section 8(a)(1) makes it unlawful for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7" of the NLRA. 29 U.S.C. § 158(a)(1). This provision has been interpreted to mean that there can be a Section 8(a)(1) violation when an employer threatens, without factual basis, that it will shut down operations if a union is recognized. See NLRB v. Gissel Packing Co., 395 U.S. 575, 618-19 (1969).

[4] J. Rodriguez, for her part, categorically denied ever speaking to R. Rodriguez about the Union. See ALJ Tr. at 870-74.

8(a)(1), this one through the actions of then-Operations Manager Fred Macey. In the period shortly before the election, Pennant designated several different members of management, including Macey, to give presentations outlining the company's views on unionization. These meetings were held in a conference room with rotating groups of 15-20 employees. Based on the testimony of several of the workers who attended these meetings, the ALJ concluded that during at least some of the meetings, Macey told workers that their health benefits and their 401(k) would be gone if they selected the Union.[5] ALJ Dec. at 12-15; see also ALJ Tr. at 101, 217, 225. At least two of these workers further testified that Macey repeatedly and emphatically commanded the workers to vote "no" at the upcoming union election. ALJ Tr. at 101, 429.[6] Based on this, and in the context of a presentation that had "little or no discussion of the give-and-take of collective bargaining," ALJ Dec. at 15, the ALJ concluded that Macey's statements had threatened employees with a loss of benefits if they selected the Union, which therefore made the statements unlawful under Section 8(a)(1). Id.

The ALJ also found a third NLRA violation. In the run-up to the election, Pennant sent a letter to its employees outlining the company's views on unionization. English-speaking employees were sent a letter that "urge[d]" them to vote against the Union. Spanish speaking employees received a translated version. According to a language expert, however, the translation was not perfect: the Spanish version did not

---

[5] The PowerPoint slides themselves contained content that the ALJ deemed unobjectionable.

[6] The ALJ credited this testimony over the contrary testimony of Macey and J. Rodriguez (who had also attended some, but not all, of the meetings that Macey led). ALJ Dec. at 13-14.

really "urge" the employees to vote no, but instead emphatically "insisted" that they vote against the Union.  ALJ Tr. at 414.  The ALJ concluded that the Spanish version of the letter constituted unlawful interference with the re-run election.  ALJ Dec. at 32.

Finally, the ALJ found that Pennant violated the NLRA when it rejected a December 2005 request from Mabry to return to work following workers' compensation leave.  Because Mabry's reinstatement request is at the center of the NLRB's Section 10(j) petition, it is important to review the circumstances surrounding that request in some detail.

As noted above, Mabry was the "face of the Union" throughout both election campaigns.  Indeed, not only was Mabry frequently quoted in the local media, but he also testified about the Union's organizing efforts at a state legislative hearing in 2003, and at a 2005 public hearing in New Haven that featured two of Connecticut's congressional representatives.  ALJ Tr. at 541, 549.  Mabry was also involved in the unfair labor practices charges that the Union filed against Pennant.  Id. at 523.

The evidence before the ALJ showed that Mabry had worked for Pennant since 1991.  Id. at 516.  He was initially hired as a Machine Operator, although at some point after that he became a Cookie Mixer.  Id. at 516, 591.  Then, in 1998, he was injured when a pallet of sugar fell off a forklift and onto him.  Id. at 591.  Mabry suffered injuries to his neck and to his cervical discs, and he missed about a month of work.  Id. at 592. When he returned, he was initially given a position working at the labeling machine, and then after that he was assigned to the crepe machine.  Id. at 592-93.  He worked at the crepe machine until September 2001, at which point he stopped work and took workers' compensation leave because he needed to have major surgery.  Id. at 593-94.  He

5

returned in April 2002, and was again assigned to be a Machine Operator on the crepe machine.  Id. at 594, 597.  At the time he returned, he presented Pennant with a note from his surgeon, Dr. Krompinger, who cleared Mabry to return to work so long as there was no overhead lifting, no repetitive bending, and no lifting over 30 pounds.  GC Exh. 24.

Mabry's initial surgery apparently did not fully solve the problem, and he again went out on workers' compensation leave between February and August 2003.  ALJ Tr. at 597.  When he returned, he again presented a note from Dr. Krompinger that cleared him to return so long as he had no over-the-shoulder lifting, and no lifting over 30 pounds.  GC Exh. 25.  At the request of Pennant's workers' compensation insurance carrier, Mabry also underwent an Independent Medical Examination ("IME") with another doctor; that doctor only cleared Mabry to work if he had no lifting over 10-15 pounds.  GC Exh. 26; ALJ Tr. at 599.  Mabry was nonetheless returned to work as a Machine Operator.  ALJ Tr. at 600-01.

Mabry needed yet another leave in November 2003, as he felt that he still was not healing properly from the surgery (a result that was confirmed by a subsequent medical exam).  Id. at 601.  Mabry eventually had a second surgery in September 2004; this surgery was performed by Dr. Waitze.  Id. at 602-03.

After Mabry felt he had sufficiently healed from the new surgery, he attempted to return to work in Fall 2005.  Pennant's insurance carrier requested another IME. Another IME was performed by Dr. Druckemiller on October 24, 2005.  GC Exh. 29.  Dr. Druckemiller concluded that Mabry could return if he was assigned to lift no more than 20 pounds.  Id.  Mabry also obtained an evaluation from his pain management

specialist, Dr. Lee, ALJ Tr. at 604.  On December 20, 2005, Dr. Lee cleared Mabry to return as long as he lifted no more than 10 pounds.  See id. at 605; GC Exh. 27.

On December 21st, Mabry brought Dr. Lee's letter to Richard Price, then Pennant's Plant Director, and Mabry asked if he could return to work.  ALJ Tr. at 606.  According to Mabry, Price briefly looked at the letter and then told Mabry that he could not return because the plant did not currently have any light-duty work available.  Id. at 607.

Mabry went back to talk with Dr. Lee to see if he could convince Dr. Lee to release him in a manner that Pennant would find acceptable.  Id. at 610-11.  Dr. Lee replied that he would wait until he received a job description from Pennant.  Id. at 611.  According to Price, he then faxed Dr. Lee a job description that stated: "The position requires a minimum weight lifting of 50 pounds.  Pushing and pulling of 250 pound racks and/or floor receptacles.  There is continuous movement, i.e. bending, twisting, climbing and lifting."  Respondent's Exh. 13; see also ALJ Tr. at 1064-69.  Dr. Lee then refused to clear Mabry to work.  ALJ Tr. at 612.

Accordingly, as of early January, Pennant was not permitting Mabry to return from workers' compensation leave.  However, at around the same time, the company that insured Pennant's worker's compensation benefits decided to stop making payments to Mabry; the insurance carrier appears to have believed that the October IME showed that Mabry was capable of working.  See ALJ Tr. at 614-15.  After a hearing before the state Workers' Compensation Commission, the insurance company agreed with Mabry that it might be best if Mabry obtained a Functional Capacity Exam from Dr. Waitze.  Id. at 615.  This exam was conducted in early January, and on

January 9, 2006, Dr. Waitze reported that Mabry could function under heavy physical demand, and that he could return to work with no restrictions. GC Exh. 30.

After meeting with Dr. Waitze, Mabry also asked him if he could refer him to a new pain management doctor, as Mabry had felt that his relationship with Dr. Lee (his prior pain management doctor) had soured. ALJ Tr. at 620. Dr. Waitze recommended Dr. Kloth, id. at 620-21, and Dr. Kloth examined Mabry on April 4, 2006. GC Exh. 31. Dr. Kloth initially concluded that Mabry could return to work without restriction. Id.

Armed with this new information, Mabry again attempted to return to work on April 10, 2006. ALJ Tr. at 622. Price looked at the new information and informed Mabry that he had to investigate the matter before he could clear Mabry. Id. at 623. It appears that Pennant then spent a number of months communicating with Mabry's doctors, including Dr. Kloth. Finally, on October 5, 2006, Dr. Kloth sent Pennant a revised assessment in which he said that Mabry could return to work so long as Mabry was not required to lift more than 20 pounds, and so long as Mabry did not have to push or pull amounts greater than 50 pounds. GC Exh. 34. Pennant then sent Mabry a letter concluding that, in light of Dr. Kloth's restrictions, Mabry could not return to work because his position required him to lift 50 pounds, and push and pull 250 pounds. Id. Pennant also declined to allow Mabry to return to a light-duty assignment, explaining that its interpretation of the medical records was that Mabry had reached maximum improvement, and that Mabry therefore did not qualify for the company's "temporary" light duty program. Id.

Price testified before the ALJ, and he sought to bolster Pennant's explanation for not allowing Mabry to return to work. Price claimed that in early 2004, he implemented

8

a light-duty policy that set a 60-day limit on the amount of time that an employee could be assigned to light-duty work. According to Price, this cap was needed to protect the employees who would pick up the slack for co-workers on light duty. ALJ Tr. at 983. Price also testified that the Machine Operator position did indeed frequently require individuals to lift close to 50 pounds, and push and pull 250 pounds, id. at 975, 1004-06, and he stated that this had been reflected in a formal job description he created in late 2003 or early 2004. Id. at 988.[7]

With this and other evidence before him, the ALJ concluded that Pennant had violated Sections 8(a)(1) and 8(a)(3) of the NLRA.[8] Despite Price's testimony, the ALJ concluded that Mabry was prevented from returning to work because of his Union activities. In the ALJ's view, Price had fabricated his description of the Machine Operator position because the actual requirements were much less onerous than what Price had outlined. The ALJ stressed that Price's description was flatly inconsistent with a description that Pennant had faxed to its insurance carrier in August 2005; that faxed description stated that Machine Operators only had to lift 11 to 25 pounds. GC Exh. 69, 70; ALJ Tr. at 1192-94; ALJ Dec. at 27. The ALJ also pointed out that Price lacked records to show that he had created the job description back in early 2004, and the ALJ further noted that the job description's format was inconsistent with the

_____

[7] Macey, who took over as Plant Director in July 2006, offered similar testimony. According to Macey, Mabry was not allowed to return because of his medical restrictions.

[8] Section 8(a)(3) prohibits an employer from engaging in "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

formatting Pennant used in its descriptions for other positions.  ALJ Dec. at 26-27.

Finally, the ALJ also observed that Price's description conflicted with the testimony of

two workers, David Armstead and Rene Caporal, as well as with Mabry's testimony.[9]

Id. at 27-28.  The ALJ credited the testimony of the workers.  Id.

The ALJ also chose not to credit Price's testimony about the 60-day cap on light

duty work.  Instead, the ALJ concluded that the 60-day cap was either fabricated, or not

usually enforced, and therefore was not the reason that Mabry had been stymied from

returning to Pennant.[10]

After finding that Pennant had committed the above-mentioned NLRA

violations,[11] the ALJ recommended a number of remedies.  First, the ALJ concluded

Pennant had to reinstate Mabry to his position "or to a light duty assignment consistent

with any medical restrictions imposed by a physician," in addition to making Mabry

whole for any lost wages and benefits.  ALJ Dec. at 33.  Relatedly, the ALJ ordered

---

[9] Indeed, Mabry testified that in 2002 and 2003 he had been permitted to work as a Machine Operator, without accommodation, notwithstanding the fact that doctors restricted him from lifting more than 30 pounds.  ALJ Tr. at 675-76

[10] According to the ALJ, Price's manner of answering questions on the witness stand, in which he frequently used the first person plural "we" and the conditional tense "would have," was cause for concern because it "appeared more along the lines of a studied attempt to conceal what really happened."  ALJ Dec. at 24.  Additionally, despite Price's claim that he had communicated the new light duty policy to employees in January 2004, there was little or no corroboration of this.  Id.  Instead, as the ALJ pointed out, a number of employees were permitted to exceed the 60-day cap after its alleged promulgation, which conflicted with Price's testimony.  See GC Exhs. 42, 45, 47, 50, 52, 54, 55, 57, 59, 62, 63, 64.

[11] The ALJ also concluded that several other alleged violations lacked merit.

Pennant to rescind its discriminatory job discrimination, as well as its light-duty policy.[12] Id. Third, the ALJ ordered that Pennant be enjoined from coercively interrogating employees about Union support, threatening employees with loss of benefits or plant closure if they selected the Union, and discriminating against employees for supporting the Union. Id. at 35. Fourth, the ALJ set aside the results of the re-run election and ordered that a new election take place. Id. at 35.

Because the ALJ ordered a new election, he also ordered "special access" remedies that would enable employees to "exercise their right to vote in an atmosphere free of unlawful interference." Id. at 34-35. These remedies required Pennant to supply the Union with contact information for Pennant's employees, provide the Union with access to company bulletin boards, provide the Union with notice of and equal time to respond to employer addresses about unionization, and to publicly read a Notice detailing the violations it had engaged in and the NLRB-ordered remedies. Id. at 33.

Shortly after the ALJ issued his decision, Pennant filed various exceptions to the ruling. The case is now pending before the NLRB, and thus the ALJ's remedies have yet to be implemented.

Meanwhile, on January 3, 2008, the NLRB's Regional Director filed a petition in this court under Section 10(j) of the NLRA. In its Petition, the NLRB essentially asked this court to implement the ALJ's remedies by way of an injunction. Doc. No. 1. The NLRB also filed a motion asking that the petition be tried based on the administrative record before the ALJ. Doc. No. 4. The court granted the motion, although it also

_____

[12] The ALJ qualified this by allowing Pennant to reimpose the light-duty policy after it had "remedied the discriminatory refusal to reinstate Mabry." ALJ Dec. at 33.

granted Pennant's request to supplement the record with some additional testimony to be produced at a hearing.  Doc. No. 22.  At that subsequent hearing, Macey testified for Pennant; the thrust of his testimony was that a Machine Operator needed to be able to lift at least 50 pounds in order to adequately perform his job, and that it would be a hardship for Pennant if it had to employ Mabry in his current condition.  Hearing Tr. at 30-39, 45-51.  Mabry testified as a rebuttal witness, and his testimony was that he currently had no restrictions on his ability to work.  Id. at 58.

After the evidentiary hearing, the parties filed memoranda outlining their positions.[13]

## II.    ANALYSIS

Section 10(j) authorizes the NLRB's Regional Director to "petition any district court of the United States . . . for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall . . . thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."  29 U.S.C. § 160(j).  In the Second Circuit, the NLRB will be entitled to the relief it requests when there is "reasonable cause" to believe that the Respondent has committed an unfair labor practice, and when the district court concludes that awarding such relief is "just and proper."  Silverman v. Major League Baseball Player Relations Comm., Inc., 67 F.3d 1054, 1059 (2d Cir. 1995).

---

[13] The NLRB's Reply Memorandum exceeded the page limit set out in the court's local rules.  Pennant filed a Motion to Strike the Reply Memorandum, see Doc. No. 50, and although the NLRB opposed that motion, it also subsequently filed a revised Reply Memorandum that complied with the page limits.  The court **GRANTS** the Motion to Strike [Doc. No. 50], and it will treat the revised Reply as timely filed.

In adjudicating the reasonable cause section of a Section 10(j) petition, the district court's task is not to finally determine if a Respondent has actually committed an unfair labor practice. Instead, the court need only find reasonable cause to believe that there will a Board decision finding an unfair labor practice, and that this Board decision will be enforced by a court of appeals. Kaynard v. Mego Corp., 633 F.2d 1026, 1033 (2d Cir. 1980). "Appropriate deference must be shown to the judgment of the NLRB, and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed." Major League Baseball, 67 F.3d at 1060.

In evaluating whether relief is just and proper, the district court must act in accord with "traditional equity practice." Morio v. N. Am. Soccer League, 632 F.2d 217, 218 (2d Cir. 1980) (per curiam). That generally means that the court must find that there are serious unfair labor practices, and that interim relief (pending final administrative decision) is needed in order to prevent the NLRB's processes from being rendered totally ineffective. See Mego Corp., 633 F.2d at 1034. More concretely, Section 10(j) relief is just and proper when it is necessary to prevent irreparable harm, or to preserve the status quo. Hoffman v. Inn Credible Caterers, Ltd., 247 F.3d 360, 368 (2d Cir. 2001). The relevant status quo to be preserved is the status quo as it existed prior to the unfair labor practice. Id. at 369.

Nothing in Section 10(j) requires the NLRB to wait for an ALJ's decision before seeking Section 10(j) relief. However, once the ALJ issues a decision, that decision can play a key role in the court's evaluation of the NLRB's petition. Importantly, this court must accord appropriate deference to the ALJ factual findings in assessing the reasonable cause prong and in assessing the just and proper prong. See Silverman v.

13

J.R.L. Food Corp., 196 F.3d 334, 337-38 (2d Cir. 1999) (per curiam) (reversing and remanding for entry of a Section 10(j) injunction when the district court based its reasonable cause analysis, and its just and proper analysis, on facts that differed from those found by the ALJ). The ALJ's factual findings are part of the record, and those findings can take on particular significance when credibility is a central issue in a case. Id. at 336.

A.      Reasonable Cause

There can be no serious dispute that the NLRB has reasonable cause to find that unfair labor practices have occurred. Admittedly, there was conflicting testimony before the ALJ, and an adjudicator could have determined that Pennant had fully complied with the law. Nonetheless, the ALJ's version of the facts plainly had a basis in the evidence, and if those facts are accepted as true, then the ALJ correctly concluded that Pennant committed violations of Sections 8(a)(1) and 8(a)(3) of the NLRA.

Pennant weakly suggests that individual aspects of the ALJ's decision were flawed. See Pennant's Mem. in Opp. at 18-19. To the extent these arguments challenge the appropriateness of various remedies, the court will deal with them as part of the just and proper analysis. However, to the extent that these arguments attempt to dispute Pennant's liability for failing to rehire Mabry, they fall short. The evidence in the record, particularly the strong evidence that Price had fabricated both the Machine Operator job description and the light duty policy that was used to prevent Mabry's return to work,[14] was sufficient to show that Pennant violated the NLRA when it refused

_____

[14] Among other things, these fabrications were established by: (1) the job description Pennant sent its insurance carrier, which conflicted sharply with Price's

14

to reinstate Mabry.  It may well be, as Pennant argues, that the ALJ put excessive

weight on certain pieces of evidence in the record, and perhaps may not have

adequately discussed other pieces of evidence.  Nonetheless, the NLRB presented

reasonable evidence to the ALJ to support its view of the facts, and thus the NLRB's

position is not "fatally flawed."  Cf. Inn Credible Caterers, 247 F.3d at 367 ("Although we

recognize that the ALJ's finding might be overturned on . . . appeal to the Board, we

believe that it was supported by reasonable cause.").[15]

Pennant also briefly questions the ALJ's findings as to the other NLRA violations.

_____

description; (2) the evidence that a number of employees were permitted to remain on
light duty for more than 60 days; and (3) evidence from Mabry and other employees
about the duties of the Machine Operator position.

[15]  In addition to making several brief arguments in its Opposition, Pennant also
attempts to make several arguments by incorporation of its briefs to the NLRB.
Pennant's Mem. in Opp. at 18-19 (citing Respondent's Exh. A, B).  By doing so,
Pennant appears to be attempting to bypass this court's Local Rules on page length:
Pennant filed a 40 page memorandum in this court that barely mentioned the
reasonable cause prong, and then also attempted to incorporate, in full, the roughly 75
pages of briefing that Pennant submitted to the NLRB as part of its appeal of the ALJ's
decision.

While the briefs on appeal are exhibits in this court, the fact that they have such
status does not relieve Pennant from arguing its position to this court, under the
reasonable cause standard.  Indeed, while Pennant's arguments on appeal may be
relevant to a reasonable cause inquiry, Pennant's NLRB brief cannot substitute for
developed argumentation on the reasonable cause issue because the brief to the NLRB
makes arguments based on a different legal standard.  See Respondent's Exh. B. at 1-
49 (attacking the ALJ's decision on a number of grounds, but never discussing the
reasonable cause standard).  Accordingly, in the court's view, all objections made in
Pennant's NLRB brief, but not articulated in Pennant's Memorandum in Opposition, are
waived.

Even if these objections were considered, however, the court would still conclude
that there was reasonable cause to find an unfair labor practice in the refusal to
reinstate Mabry.  To the extent Pennant's objections attack the ALJ's findings on liability
(as distinguished from the ALJ's conclusions as to remedy), Pennant's arguments either
fall short on their own terms, or discredit pieces of evidence that were not necessary to
support the ALJ's conclusions.  See Respondent's Exh. A, B.

In the court's view, Petitioner has reasonable cause to believe that these violations took place.

B.    Just and Proper

The main dispute between the parties surrounds the just and proper prong.  In resolving this dispute, it makes sense to separate out the individual remedies that Petitioner seeks.

*1. Reinstatement of Mabry*

In the circumstances of this cases, the court concludes that it is just and proper to order that Mabry be reinstated.

First, interim relief is justified by the need to restore the status quo.  As discussed above, the proper status quo is the status quo as it existed prior to Pennant's unfair labor practice.  In this case, Pennant committed an unfair labor practice when it denied reinstatement on the basis of a fabricated Machine Operator job description.[16] The status quo that needs to be restored is one in which Pennant's pretextual reason cannot operate to exclude Mabry from employment.

It is of course true, as Pennant points out, that Mabry was not physically working at Pennant prior to December 2005.  But that does not mean that Mabry's return would alter the status quo.  While Mabry was out on worker's compensation leave, Pennant's

_____

[16] To the extent the court is required to make findings of fact to support these conclusions, the court concludes that the Machine Operator position does not require individuals to lift a minimum of 50 pounds.  The existence of that requirement is refuted by, among other things, (1) the fax Pennant sent its insurance carrier documenting that Machine Operators only needed to lift 10-25 pounds, and (2) the testimony from Mabry, which the ALJ credited, that Mabry was able to perform his job without restriction or accommodation at a time when doctors restricted him to lifting no more than 30 pounds.

policies gave him the right to return to work when he was medically able to do so. Hearing Tr. at 47-48; <u>see also</u> Pennant's Mem. in Opp. at 2 ("It is Mabry's right as an employee on workers' compensation to return to work if medically able based on verifiable medical evidence."). The reinstatement request is really just a request for Pennant to allow Mabry to exercise his preexisting right to return if medically able, without being stymied by a discriminatory construct of the medical requirements he needed to meet.

Interim relief is also justified by the need to prevent any chilling effect on employee support for the Union. As the Second Circuit has recognized, when there is evidence that an unlawfully terminated employee was an "active and open" union supporter, reinstatement is "clearly . . . just and proper" because the employee's termination risks "a serious adverse impact on employee interest in unionization." <u>Kaynard v. Palby Lingerie, Inc.</u>, 625 F.2d 1047, 1053 (2d Cir. 1980). Indeed, such a conclusion is especially appropriate in this case because Mabry was not only an active and open union supporter, but was "the face of the Union" during its organizing drives. It is also appropriate to draw this conclusion in light of the employee turnover that Pennant has experienced, <u>see</u> Hearing Tr. at 51-52, and that it can be expected to experience, until the administrative process can be finally resolved. Common sense dictates that a union supporter will be most persuasive with the co-workers that he knows and is friendly with, as opposed to co-workers who do not know him well. Thus, as Mabry's time away from Pennant increases, the percentage of workers who know him well will decrease, which can be predicted to decrease his effectiveness as a Union

advocate in the run-up to the next Union election.[17]

Pennant takes the position that the NLRB must specifically introduce evidence of a chilling effect, and that the court cannot infer a chilling effect from other evidence. That argument is inconsistent with the Second Circuit's opinion in Palby Lingerie, where the court inferred a chilling effect solely from the fact that discharged employees had been open union supporters. See 625 F.2d at 1053.

Pennant also argues that Petitioner has not introduced any evidence that would go to the just and proper prong because Petitioner did not specifically litigate the just and proper issue before the ALJ, and did not introduce any evidence that would go to that issue at the hearing before this court. However, the Second Circuit has upheld the issuance of a Section 10(j) injunction when the sole evidence before the district court consisted of the administrative record and the ALJ's decision. See J.R.L., 196 F.3d at 337-38; Palby Lingerie, 625 F.2d at 1050-51, 1053. Certainly, there is nothing in the statute that mandates a live evidentiary hearing to determine whether or not relief is "just and proper." See 29 U.S.C. § 160(j). Here, none is required, because the evidence already in the record shows that it is just and proper to reinstate Mabry.

Pennant next argues that a chilling effect cannot be inferred here because no union has yet been certified to represent any of Pennant's employees. Pennant's Mem. in Opp. at 29. This argument has no merit. There is no reason to think that a chilling effect can only take place after a union has already been certified. And there are

---

[17] In this regard, it is of no moment that Mabry has never actually been terminated from his position. The important point is that, without injunctive relief, Mabry will not be present in Pennant's plant during the pendency of the administrative process.

certainly reasons to think that employees could be faced with a chilling effect when a union has been campaigning for recognition.  See, e.g., Pye v. Excel Case Ready, 238 F.3d 69, 71-72, 74-76 (1st Cir. 2001); NLRB v. Electro-Voice, Inc., 83 F.3d 1559, 1563, 1572-73 (7th Cir. 1996).  In this case, the ALJ has recommended that a re-run election be held, and the Petitioner has reasonable cause to believe that this re-run election will ultimately take place.  It makes no sense to deny an injunction simply because the Union has yet to be certified as a bargaining representative.

Finally, Pennant argues that it will be burdened if it has to reinstate Mabry during the pendency of the adjudicative process, and it claims that Mabry is not able to do the work required by his position.  Pennant asserts, as it did before the ALJ, that Machine Operators need to be able to lift 50 pounds.  Pennant also asserts that Mabry's doctors have not cleared him to lift this much weight.

This argument is flawed to the extent it rests on the discredited 50 pound lifting requirement.  As discussed above, the ALJ, and the court, have concluded that the 50 pound lifting requirement was an exaggeration.

This is not to say, however, that it is definitively clear that Mabry can perform the Machine Operator position.  While the 50 pound requirement may be exaggerated, the NLRB has provided no reason to question the job description Pennant faxed its insurer; that description stated that Machine Operators need to be able to lift 11 to 25 pounds. The court credits that job description, and so the court must consider whether Mabry is medically able to lift 11-25 pounds.

Mabry asserted in his testimony that he currently has no medical restrictions. See Hearing Tr. at 58.  However, the evidence on this issue is conflicting.  It is true, as

Mabry noted, that Dr. Waitze examined the results of a functional capacity examination in early 2006, and he concluded that Mabry "should not have any restrictions on him at work." Petitioner's Exh. 1. The functional capacity examination had, in turn, found that Mabry could "frequently" lift up to 50 pounds. GC Exh. 36. In October 2006, however, Dr. Kloth cleared Mabry to work with a restriction that Mabry lift no more than 20 pounds. Additionally, Dr. Druckemiller and Dr. Lee had, in late 2005, placed lifting restrictions of 20 and 10 pounds respectively.

The parties have done little to help the court resolve the conflict between these medical experts, and the ALJ never definitively determined Mabry's exact limitations because that issue was not squarely before him. The court notes that none of these doctors testified before the ALJ, and they also did not testify before the court at the supplemental hearing. The court is therefore in the unenviable position of sorting through medical testimony with no guidance.

Nonetheless, the court must resolve this dispute, and it does so by concluding that Mabry is capable of lifting at least 25 pounds (and perhaps more). First, Dr. Waitze was the surgeon who performed Mabry's most recent surgery, and so the court concludes he was the surgeon who was likely most familiar with Mabry's condition; the court therefore puts more weight in his evaluation than in the other evaluations. Second, Dr. Waitze appears to have based his assessment on a functional capacity exam that was specifically designed to test Mabry's abilities. By contrast, the record is not clear on how the other doctors reached their conclusions.[18] In fact, Dr. Druckemiller

---

[18] Indeed, Dr. Lee and Dr. Kloth are pain management specialists, and there is a distinct possibility that their work restrictions do not reflect Mabry's abilities but instead

appears to have merely interviewed Mabry and examined his medical records as they existed before Mabry underwent a functional capacity exam.  GC Exh. 29.

The court finally notes that a conclusion that Mabry can lift at least 25 pounds is not especially different from the 20 pound figures used by Drs. Druckemiller and Kloth. Thus although the issue is not free from doubt, the court finds, on the record before it, that Mabry is able to lift at least 25 pounds.  The court therefore concludes that Mabry can perform the Machine Operator position, and there will be little burden on Pennant if it is forced to reinstate Mabry.

2.    *The Light Duty Policy*

The NLRB also asks the court to rescind Pennant's 60-day light duty policy.  The court agrees that such relief is just and proper to fully effect Mabry's reinstatement. Although the court concludes that Mabry is currently able to perform the Machine Operator position, the possibility exists that Mabry will reinjure himself, or will otherwise become unable to fully perform the duties of the Machine Operator position (as has happened on multiple occasions previously).  If that scenario comes to pass, Pennant should not be permitted to exclude Mabry from the workplace on the basis of a policy that has either been fabricated, or that has been applied in a discriminatory manner to exclude Union supporters.

Pennant suggests that it will be burdened if it cannot apply its light-duty policy, and it contends that there are legitimate reasons why Pennant might wish to use a

---

are designed to minimize Mabry's pain.  If Mabry is willing to work through pain, and is able to perform the requirements of his job, it is difficult to see how there would be much of a burden on Pennant if Mabry returned to work.

consistently applied light-duty policy in the future.  <u>See</u> Hearing Tr. at 46-51.  The court

recognizes this, and its injunction is therefore not meant to preclude Pennant from re-

adopting a light-duty policy if it wishes to do so.  However, if Pennant does adopt a

light-duty policy going forward, based on sound business reason(s), it must apply this

policy in a non-discriminatory manner.

      *3.    Other Remedies*

In addition to seeking remedies related to Mabry's reinstatement, the NLRB also

seeks a number of remedies designed to ensure that any future election will be run free

from discriminatory taint.  Specifically, the NLRB seeks an injunction that, in pertinent

part: (1) prevents Pennant from  coercively interrogating employees about their Union

support; (2) prevents Pennant from threatening employees with losses of benefits or

plant closures if they select the Union; (3) prevents Pennant from discriminating against

any employees for supporting the Union; (4) prevents Pennant from interfering with

employees in their exercise of rights granted them by Section 7 of the NLRA; (5)

requires Pennant to supply the Union with contact information for all of the employees

in the proposed bargaining unit; (6) requires Pennant to give the Union equal time and

facilities to respond to any address by Pennant on the question of Union representation;

and (7) requires Pennant to give the Union access to Pennant's employee bulletin

boards.  The NLRB's request tracks closely the remedies that the ALJ recommended.

The court agrees with the ALJ that these remedies are likely appropriate <u>in the</u>

<u>immediate run-up to any re-run election</u>.  But the question before this court is whether

the remedies are needed to preserve the status quo, prevent irreparable harm, or

otherwise ensure that any Board orders will ultimately be effective. However, it may be

a year (or more) before any such election takes place.

If the NLRB had introduced evidence showing that Pennant was <u>currently</u> attempting to intimidate or coerce its employees, the court would likely conclude that the requested remedies were just and proper. However, with the exception of Pennant's continued refusal to rehire Mabry, the NLRB has presented no evidence that Pennant is <u>currently</u> committing any unfair labor practices. Nor has the NLRB presented any evidence that Pennant is likely to interfere with the election in the time period before the Board finally rules in this case. Instead, as the NLRB even recognized in its brief, "all of [Pennant's] alleged [Section] 8(a)(1) violations occurred in direct response to the Union's re-energized organizing drive and <u>imminent re-run election</u>." NLRB's Mem. in Support at 16 (emphasis added).

The court does not doubt that there is a real possibility that Pennant may illegally attempt to interfere with Union organizing in the immediate run-up to a new election. But the court does not find that such interference is likely to occur before the Board issues a ruling in the case, and the court therefore sees no need for injunctive relief.[19] If the Board ultimately orders a new election, it can issue remedies at that time to

―――――――――――――――

[19] Pennant briefly suggests, without any citation to authority, that this court lacks the power to impose some, but not all, of the ALJ's recommended remedies. According to Pennant, this court must either impose all of the ALJ's remedies, or none of them. Pennant's Mem. in Opp. at 26 n.23.

The court rejects this argument. There is absolutely nothing in the language of Section 10(j) that contains such a limitation. Nor does such a limitation make sense: a Section 10(j) proceeding is an independent proceeding, designed to serve different purposes from an ALJ's recommended decision, and it makes no sense to completely tie Section 10(j) remedies to an ALJ's remedies. Indeed, if district courts were forced to treat an ALJ's remedies as a "package deal," it would be a significant departure from the "traditional equity practice" that is supposed to guide district courts in Section 10(j) proceedings.

prevent Pennant from improperly interfering with the then soon-to-be-held election.  The NLRB may also return to this court, if it is appropriate to do so.

## III.    CONCLUSION

Pennant's Motion to Strike the Reply Memorandum [Doc. No. 50] is **GRANTED**, and the NLRB's first-filed Reply [Doc. No. 49] is stricken.  The court will treat the NLRB's revised Reply [Doc. No. 52] as timely filed.

The NLRB's Petition is **GRANTED IN PART AND DENIED IN PART**.  Within five days, Pennant must offer Lee Mabry reinstatement to his former job as a Machine Operator, without prejudice to his seniority or to any other rights or privileges previously enjoined.  Pennant shall remove from its files any reference to the unlawful denial of reinstatement, and notify Mabry in writing that this has been done and that the December 2005 and April 2006 denials of reinstatement will not be used against him in any way.

Additionally, by this same date, Pennant shall rescind its 60-day limit on light duty work.  Pennant may subsequently reimpose a light duty policy, but any such policy must be applied in a non-discriminatory manner.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 14th day of April, 2008.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge